**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**MAINSTREAM ADVERTISING, INC.,**
a California corporation,

                                                  **Case No.** _____

       Plaintiff,

       v.

**MONIKER ONLINE SERVICES, LLC**,
a Florida limited liability company,
**OVERSEE.NET, INC**., a California corporation,

       Defendants.
_____/

**COMPLAINT FOR BREACH OF CONTRACT,**
**CONVERSION, UNJUST ENRICHMENT AND UNFAIR COMPETITION**
**JURY TRIAL REQUESTED**

Plaintiff MAINSTREAM ADVERTISING, INC. ("Mainstream" or "Plaintiff"), through its undersigned counsel and for its Complaint against Defendants OVERSEE.NET, INC. ("Oversee") and its wholly owned subsidiary MONIKER ONLINE SERVICES, LLC ("Moniker") (collectively "Defendants"), alleges as follows:

## I.        PARTIES, JURISDICTION AND VENUE

1.       Mainstream is a California corporation having its principal place of business at 1701 Pacific Ave., Suite 190, Oxnard, California 93033.

2.       On information and belief, Oversee is a California corporation having its principal place of business at 515 South Flower Street, 44th Floor, Los Angeles, California 90071.

3.       On information and belief, Moniker is a Florida limited liability company having its principal place of business at 20 Southwest 27th Avenue, Suite 201,

Pompano Beach, FL 33069.  On further information and belief, Moniker is a wholly owned subsidiary of Oversee.

4.      Upon information and belief, Oversee controls Moniker, acts in concert with Moniker for all purposes relevant to this Complaint, shares in the profits earned from registration and/or monetization of domain names by Moniker and other subsidiaries (including but not limited to Domain Sponsor), and therefore has been unjustly enriched by Moniker's unlawful conduct as described herein.

5.      In approximately 2005, Mainstream retained Moniker to register, hold and/or host Mainstream's numerous and valuable domain names and to monetize its web traffic, as explained below.  Mainstream entered into a written agreement with Moniker (the "Contract") for these services.   A true and correct of the Contract is attached as **Exhibit A** hereto.

6.      Mainstream seeks damages and injunctive relief for the herein alleged unlawful acts by Defendants, including (i) breach of contract, (ii) conversion, (iii) unjust enrichment, and (iv) unfair competition under the common law of the state of Florida.

7.      This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. 1332(a)(1) in that (i) the matters in controversy exceed the sum or value of $75,000 exclusive of interest and costs, and (ii) the dispute is between business entities of different states (namely, California and Florida).

8.      This Court has personal jurisdiction over Defendants because the Defendants' business activities are conducted within the territorial confines of this judicial district and division.  Moreover, Moniker is registered as a Florida limited liability company owned and controlled by Oversee.

9.     Venue is proper in this judicial district and division pursuant to 28 U.S.C. §1391(b) because a substantial portion of the events giving rise to the claims herein alleged occurred in this judicial district and division.  In addition, Paragraph 23 of the Contract provides that the parties agreed that "any claim, dispute, action or litigation . . . relating to or arising out of this Agreement or [Moniker's] performance of services for [Mainstream] shall be brought and maintained exclusively in the state or Federal courts located in Miami/Dade County, Florida."

## II.     STATEMENT OF FACTS RELEVANT TO ALL COUNTS

### A.  Plaintiff's On-line Monetization Business

10.     Mainstream is a nationally recognized comprehensive on-line advertising company with over ten years of experience in search engine optimization (SEO), email marketing, pay per click management, on-line media buying and search marketing. Through these services, Mainstream offers a variety of low-cost and results driven on-line advertising opportunities to its clients.

11.     Through use of its proprietary technologies, Mainstream is able to reach approximately 85% of the Internet's on-line audience through third-party internet search engines such as Google, MSN and Yahoo.  Mainstream is able to achieve this level of market penetration through its comprehensive strategic registration and acquisition of value-based and business-generating domain names.   Once Mainstream acquires a desired domain name, it creates a site containing certain advertising content which includes a variety of links to goods and services which ultimately direct visitors to the site to Mainstream's clients.    In turn, Mainstream is compensated for that on-line

referral.   This is one of the many ways in which Mainstream monetizes its on-line advertising services through its select registration and holding of domain names.

12.     To obtain these strategic domain names, Mainstream researched many of the domain name registration and hosting services available.   Mainstream ultimately engaged Moniker in 2005 to acquire and host domain names for its on-line advertising business, including monetizing those domain names through placement of links and other content.

### B.  Mainstream's Registration and Hosting Relationship with Moniker

13.     To date, Mainstream has registered, hosted and/or maintained approximately 120,000 internet domain names through Moniker's registration and hosting services.  In connection with these services, both Mainstream and Moniker (and therefore Oversee) agreed to abide by the terms, conditions and obligations of the Contract shown at **Exhibit A**.

14.     These terms and obligations include those in Paragraph 2 of the Contract, which addresses certain fees and payments to be paid to Moniker for its services.   As provided in Paragraph 2 regarding automatic renewal, when a domain name registered by Moniker was scheduled to expire, the "client," here Mainstream, agreed to allow its applicable credit cards to be charged for the registrations to be automatically renewed:

> You are solely responsible for ensuring that any services you desire to renew are renewed . . . [a]ny renewal of your services with [Moniker] is subject to our then current terms and payment of all applicable service fees at the time of renewal.   In the case of a re-registration the renewal is subject to the domain name registry's acceptance of your domain name registration.   You agree that if you paid by credit card for any services provided by Moniker, Moniker is authorized . . . to automatically charge your credit card and renew the applicable services on or before their renewal date using the credit card information you have provided us,

unless you have notified us (as provided herein) that you do not wish to participate in our automatic renewal process.

15.     Paragraph 6 of the Contract addresses domain name renewals, expirations and transfers.   More specifically, the contract sets forth the procedure in the event of expiration of domain names hosted and/or previously registered through Moniker's services.   When a domain name registration expires, it may be maintained by Moniker for a grace period during which, Moniker can have a placard site (with certain sponsored links) attached to the domain name registration.   Moniker affords the opportunity to have the customer (here Mainstream) obtain a portion of any revenues realized from this placard site – so long as certain contact and financial information is provided.   Lastly, Paragraph 6 incorporates by reference Moniker's "Domain Deletion and Auto-Renew Policy."

16.     Attached hereto as **Exhibit B** is a true and correct copy of the "Domain Deletion and Auto-Renewal Policy" (hereinafter the "Renewal Policy") applicable during the relevant period of the relationship between Moniker and Mainstream.   As shown in **Exhibit B**, the Renewal Policy specifies that for customers who chose Moniker's "Auto-Renew" feature, Moniker will automatically renew the domain name registrations, so long as the customer has a valid credit card on file.   Otherwise, Moniker - starting some 75 days prior to expiration of each applicable domain name – would contact its customer via email (or other agreed means) as to renewal.   If the customer does not respond, these emails may continue for up to 21 days after the expiration of that domain name registration.   Moniker agreed to send these reminders weekly during this 99-day period.

**C. Moniker's Acts of Improper Lapsing and Transfer of Domain Names to Oversee**

17.     In violation of the terms of the Contract (and the incorporated Renewal Policy), Moniker allowed numerous domain name registrations previously registered, owned and monetized by Mainstream to lapse without the requisite notice. Many of those registrations were then immediately transferred to Moniker's affiliate accounts, who were all Oversee subsidiaries or related entities.

18.     Upon information and belief, the weekly email notices regarding expiration which were required to be sent during the 99-day period were either never sent, or transmitted in a deliberate and capricious manner so that they would be blocked by Mainstream's e-mail computer systems, including through their reasonable and standard spam filters.

19.     As one example, Moniker transferred a number of Mainstream's domain name registrations to Oversee subsidiary Domain Sponsor, which then monetized the associated websites based upon Mainstream's prior verified Internet traffic history. Thus, Oversee was able to improperly acquire these high value domain names, which Mainstream had proven to be of value, and convert them into its own property so it could benefit unjustly.

20.     In each instance of these improper domain name registration transfers, Moniker wholly failed to provide the Auto-Renewal of the domain name registrations under its own Renewal Policy.     Moreover, Moniker failed to provide notice to Mainstream via email or any other means under in the Renewal Policy.

21.     Upon information and belief, Defendants intentionally and negligently violated and/or failed to abide by their own Contract and Renewal Policy, ultimately

causing these domain names registered in Mainstream's name to lapse.   When that happened, Moniker caused the registration to be transferred to Oversee, or one of Oversee's subsidiaries such as Domain Sponsor.   Oversee then utilized the domain name registration for its own monetary and pecuniary gain in an improper manner. Upon information and belief, Defendants knowingly and intentionally caused these results, knowing they would cause harm to Mainstream.

22.   Defendants have converted some 83,000 domain names previously registered, monetized and employed by Mainstream.   These registrations were ultimately transferred by Moniker to Oversee for use by its various controlled subsidiaries.   The WHOIS information regarding these lapsed domain names shows that the current registrant address for all these domain names is that of Oversee, or one of Oversee's subsidiaries.

23.   As a direct or proximate result of Defendants' conduct, Mainstream has been greatly and irreparably harmed as a result of lost revenues involving these lapsed domain names, lost profit opportunities at monetization regarding these assets, and other economic damages that have yet to be calculated or determined.

24.   In July 2009, Mainstream attempted to buy back 3,652 domain names from Moniker (*i.e.*, domain names that had improperly lapsed because of Defendants' breach of their Contract).   Moniker gave Mainstream an invoice charging $132,965 for these names which were then in Oversee's control and possession.   A true and correct copy of this invoice is attached at **Exhibit C**.   Attached as **Exhibit D** is a copy of the electronic wire transfer receipt showing that Mainstream paid Moniker's price of $132,965.00 to secure the return of these 3,652 domain name registrations.   Despite

paying the invoice amount demanded by Moniker, Mainstream did not obtain the domain names it purchased.  Those domain names remain in the possession and control of Oversee.

## COUNT I

## BREACH OF CONTRACT UNDER FLORIDA COMMON LAW
(against all Defendants)

25.     This Count I is a claim for breach of contract arising under the common law of the state of Florida.

26.     The allegations of Paragraphs 1 through 24 are incorporated herein by reference with the same force and effect as if set forth in full below.

27.     Moniker entered into a valid, binding and enforceable agreement with Mainstream, the terms, obligations, and requirements of which are found in the Contract, as well as the Renewal Policy which is incorporated by reference in its entirely in the Contract.

28.     According to the Contract, Moniker agreed to hold the domain names of Mainstream in good faith and enable those names to drive web traffic so that third-party users of the Internet could access Mainstream's websites and allow Mainstream to profit thereby.

29.     Mainstream performed all of the requisite obligations and duties required by the Contract (and its Renewal Policy), including proper, full and compete payment for registration of the subject domain names.   Mainstream also provided appropriate and accurate contact information to Moniker, including applicable email addresses so it could receive notices (including but not limited to expiration notices).

30.     Defendants materially and wholly breached the Contract by deceptively hiding domain names that were previously registered, owned and/or employed by Mainstream, failing to renew these subject domain name registrations, and then transferring these domain names to Oversee (and its various subsidiaries) to unfairly obtain the advertising and monetization value of these websites previously created and established by Maintream.

31.     Defendants engaged in practices that increased the likelihood that these domain names would lapse and fall outside the control and ownership of Mainstream. These practices included, but are not limited to, failing to provide appropriate expiration notices to Mainstream regarding these various domain names.   They also included Defendants' failure in July 2009 to return some 3,652 domain names to Mainstream, after Mainstream accepted the terms offered by Moniker and wired the agreed-to invoice amount so that Moniker would return these previously registered domain names.

32.      Both the Contract and the July 2009 agreement contained an implied covenant of good faith and fair dealing that obligated Defendants to perform the terms and conditions of those agreements in a manner that was fair and in good faith, and therefore conversely to refrain from doing any acts (or omissions) that would impede Mainstream from performing any or all of the conditions of the Contract which it agreed to perform.   Such covenants obligated Defendants to refrain from doing any acts which would deprive Mainstream of the benefits of the Contract (and the related Renewal Policy).   Such covenants of good faith and fair dealing further obligated Defendants to deal with Mainstream fairly, honestly and reasonably, and to preserve those domain name registrations for the sole, use, enjoyment and monetization by Mainstream.

33.     Defendants breached the Contract (and related and incorporated Renewal Policy) without good, sufficient or justified cause, for reasons extraneous to the Contract, and as a direct and/or proximate result, frustrated and impeded Mainstream's enjoyment and benefits derived from the Contract, and its ability to monetize the domain names registered therefrom.

34.     Moniker thereby breached the July 2009 agreement to return the approximately 3,652 domain names.   Likewise, Moniker breached its implied covenant of good faith and fair dealing by converting these 83,000 domain names which had improperly lapsed because of Moniker's improper acts and omissions.

35.     Oversee is responsible for the actions of Moniker, as well as Domain Sponsor, under an agency theory.   Moreover, on information and belief, Moniker is wholly owned, operated, and controlled by Oversee.

36.     Mainstream has suffered damages as a direct and proximate result of Defendants' breach.

## COUNT II

## CONVERSION UNDER FLORIDA COMMON LAW
### (against both Defendants)

37.     This Count II is a claim for conversion under the common law of the State of Florida.

38.     The allegations of Paragraphs 1 through 36 are incorporated herein by reference with the same force and effect as if set forth in full below.

39.     Mainstream has a clear ownership right or right of possession of the subject domain names that it had previously registered, enjoyed, benefited from and/or monetized through the Contract with Moniker.

40.     Mainstream viewed these domain names as its property, the totality of which had considerable and monetary value to Mainstream.

41.     Moniker allowed Mainsteam's ownership rights in this property to lapse, and then without the requisite warning, began a systematic campaign to transfer ownership rights in this property to Oversee, so as to create a windfall to Moniker's parent company.

42.     Since this systematic transfer campaign began, Moniker has allowed Oversee (including its subsidiary Domain Sponsor) to wrongfully convert this property from Mainstream after these websites had shown realized value in the Internet marketplace.   These stolen domain names are now owned and employed by Oversee.

43.     The foregoing conduct of Defendants constitutes a conversion of Mainstream's domain names, property, rights and interests.

44.     As a consequence of the foregoing, Mainstream has suffered and will continue to suffer irreparable harm and loss.

45.     Mainstream is also entitled to, and seeks recovery of, its attorneys' fees and costs.  Such damages shall be determined in an amount to be proven at trial.

**COUNT III**

**UNJUST ENRICHMENT UNDER FLORIDA COMMON LAW**
(against all Defendants)

46.     This Count III is a claim for unjust enrichment arising under the common law of the state of Florida.

47.     The allegations of Paragraphs 1 through 45 are incorporated herein by reference with the same force and effect as if set forth in full below.

48.     Mainstream has been damaged by Defendants' acts and omissions which have resulted in unjust enrichment to Moniker and Oversee.   These acts include Moniker's allowing Mainstream's domain name registrations to lapse, without providing appropriate and sufficient notice under the Contract (and the incorporated Renewal Policy) regarding expiration, the result of which was the transfer of these domains to Oversee and its various subsidiaries.

49.     Since the transfer, these domain names -- which had been developed, perfected, optimized and/or promoted by Mainstream – are being used and enjoyed by Oversee.   This has allowed Moniker to step into the shoes of Mainstream, employ already proven and established domain names, and divert Mainstream's web traffic to these domain names to itself.   In turn, Oversee (both directly and through its wholly owned subsidiaries) now monetizes, benefits and enjoys rights to these domain names.

50.     This aforementioned unjust enrichment has damaged Mainstream in an amount that will be ascertained and determined at trial.

## COUNT IV

### FLORIDA COMMON LAW UNFAIR COMPETITION
(Against all Defendants)

51.     The allegations of Paragraphs 1 through 50 are incorporated herein by reference with the same force and effect as if set forth in full below.

52.     The foregoing conduct of Defendants constitutes an unfair method of competition.  Under Defendants' plan to usurp Mainstream's established domain names, Moniker and Oversee acted in concert to fail to provide adequate and reasonable expiration notices, then transfer these domain names to Oversee and its various wholly owned subsidiaries.   Once transferred, these domain names were used for similar

purposes, advertised substantially similar content, and followed the same types of advertising links previously employed by Mainstream.

53.     Therefore, there is a risk of confusion, in that on-line customers who had visited Mainstream's websites accessed through its domain names (prior to their improper transfer) will now go to an Oversee related website that includes similar links and monetization opportunities.

54.     As a consequence of the foregoing, Mainstream has suffered and will continue to suffer irreparable harm and loss.

## **PRAYER FOR RELIEF**

WHEREFORE, Mainstream respectfully prays that this Court enter such preliminary and final orders and judgments as are necessary to provide it with the following relief:

A.     A preliminary and then permanent injunction enjoining Defendants, together with their officers, agents, employees, attorneys, heirs, successors and assigns, and all those in privity with them, from transferring any more of Mainstream's previously registered, owned, monetized and hosted domain names;

B.     An Order requiring Moniker, Oversee, and any of Oversee's affiliate and/or subsidiary businesses to return and/or transfer of all of the improper lapsed and transferred domain names to Mainstream that are now Defendants' direct and/or indirect possession and control;

C.     Entry of a final money judgment awarding Mainstream its actual damages and the Defendants' profits;

D.     An award of compensatory damages and attorney's fees;

F.      An award of punitive damages for the Defendants' willful conduct;

G.      An award of Mainstream's taxable costs and attorney's fees; and

H.      Such other relief as the Court deems appropriate.

### REQUEST FOR JURY TRIAL

Mainstream requests a trial by jury for all claims so triable.

Dated:  October 6, 2011

Respectfully submitted,

*/s/ **Robert H. Thornburg***

Ava K. Doppelt, Trial Counsel
Florida Bar No. 393738
Robert H. Thornburg
Florida Bar No. 630829
**Allen, Dyer, Doppelt, Milbrath**
     **& Gilchrist, P.A.**
777 Brickell Avenue, Suite 1114
Miami, Florida 33131
Telephone:  305-374-8303
Facsimile:    305-374-8306
E-mail:   adoppelt@addmg.com
               rthornburg@addmg.com