UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11- 23619-CIV-MARTINEZ/MCALILEY

MAINSTREAM ADVERTISING, INC.,
a California corporation,

    Plaintiff,
vs.

MONIKER ONLINE SERVICES, LLC,
a Florida limited liability company,
OVERSEE.NET, INC., a California corporation,

    Defendants.
_____/

**DEFENDANTS, MONIKER ONLINE SERVICES, LLC AND OVERSEE.NET'S, MOTION FOR RULE 11 SANCTIONS AND INCORPORATED MEMORANDUM OF LAW**

    Pursuant to Rule 11 of the Federal Rules of Civil Procedure, Defendants, Moniker Online Services, LLC ("Moniker"), and Oversee.net ("Oversee") (collectively, the "Defendants"), serve[1] their Motion for Rule 11 Sanctions and Incorporated Memorandum of Law on the date set forth below.

## I.    INTRODUCTION

    Plaintiff, Mainstream Advertising, Inc. ("Mainstream"), has filed a 119 page, 6 count Second Amended Complaint[2] against Defendants. Mainstream's claims rest primarily on

---

[1] Pursuant to Rule 11, this motion shall not be filed with or presented to the court unless, within 21 days after service, the claims against Defendants are not withdrawn or appropriately corrected.

[2] Mainstream initially filed its claim in California but then agreed to dismiss that action and re-file in Florida. Defendants filed a Motion to Dismiss Mainstream's initial Complaint filed in this Court for lack of subject matter jurisdiction (DE #9). Mainstream thereafter filed an Amended Complaint (DE #10). Following a conference between counsel as to the sufficiency of the allegations in the Amended Complaint, Mainstream then filed its Second Amended Complaint (DE #18). The Second Amended Complaint purports to state claims against Moniker for breach of contract, and against both Defendants for conversion, unjust enrichment, federal and common law unfair competition, and trademark infringement.

the false allegations that (i) Moniker, in breach of its agreement with Mainstream, improperly allowed the registrations (the "Domain Registrations") for 83,000 domain names registered by Mainstream with Moniker (the "Domains") to lapse without proper notification to Mainstream; and (ii) Defendants improperly took control of, and are improperly using, the Domains.  Mainstream also alleges that Defendants failed to deliver to Mainstream 3652 domain names which Moniker had renewed on Mainstream's behalf (the "Renewed Domains") and which Moniker agreed to return to Mainstream per the terms of an agreement reached by Moniker and Mainstream in July 2009 whereby Mainstream would reimburse Moniker for the renewal fees paid by Moniker to renew such registrations.

Each of these claims is nothing short of baseless.  *See generally* Declaration of Kevin Hite ("Hite Dec.") (attached hereto as Exhibit "A").  Mainstream and/or its counsel would have known the claims were false if they had conducted a proper pre-filing investigation.  A cursory factual investigation, less even than that required to comply with Rule 11, would have revealed that (i) the Domain Registrations lapsed due solely to Mainstream's failure to renew them prior to expiration; (ii) Moniker provided Mainstream with the required notices regarding such pending expirations; (iii) at all times, Mainstream had actual or constructive knowledge of the status of the Domains and had complete control over the renewal or non-renewal of the Domain Registrations; (iv) once the respective registrations lapsed, Mainstream lost any ownership interest in, or rights to, the Domains; and (v) the Renewed Domains have been in Mainstream's account and accessible to Mainstream since July 16, 2009.

These inconvenient facts, however, would have undercut any claim of liability against Defendants and would have resulted in a dismissal of the Complaint at the initial

pleading stages.  As more fully set forth, *infra*, Mainstream's Second Amended Complaint is in violation of Rule 11, and sanctions should be imposed.

## II.     ARGUMENT

### A.     RULE 11 PENALIZES PARTIES AND COUNSEL WHO PROSECUTE FRIVOLOUS CLAIMS LIKE THE ONES ASSERTED HERE.

Rule 11 requires district courts to sanction attorneys and parties when they prosecute baseless claims.  *Turner v. Sungard Business Systems, Inc.*, 91 F.3d 1418, 1422 (11th Cir. 1996).  Rule 11 imposes an affirmative duty on counsel to make some pre-filing inquiry into the legal and factual basis of a claim so that counsel can be in a position to certify that a complaint is well-grounded in both fact and law.  *Worldwide Primates, Inc. v. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996).  *See Donaldson v. Clark,* 819 F.2d 1551, 1555 (11th Cir. 1987) (en banc) (Rule 11 "stresses the need for some prefiling inquiry....").

Rule 11 sanctions are proper when a party files a pleading that has no reasonable factual basis.  *Worldwide*, 87 F.3d at 1254; *Battles v. City of Ft. Myers*, 127 F.3d 1298, 1300 (11th Cir. 1997); *Universal Communications Systems, Inc. v. Turner Broadcasting System, Inc.*, No. 05-20047, 2005 WL 3956648 at *1 (S.D. Fla. Aug. 29, 2005).

> Rule 11 places an affirmative duty on an attorney to inquire into the factual basis of a paper before filing it with the court.  A signor can no longer rely solely on his personal interpretation of the facts, conclusory allegations of fact, speculation, suspicion, rumor or surmise to sustain a reasonable belief.
>
> *Gutierrez v. City of Hialeah*, 729 F. Supp. 1329, 1333 (S.D. Fla. 1990).

A court can issue Rule 11 sanctions against a party, even though the party is neither an attorney nor the signor of the pleadings.  *See Souran v. Travelers Ins. Co.,* 982 F.2d 1497, 1508 n.14 (11th Cir. 1993) ("Even though it is the attorney whose signature

violates the rule, it may be appropriate under the circumstances of the case to impose a sanction on the client."). Imposition of sanctions on the attorney rather than, or in addition to, the client is sometimes proper "since it may well be more appropriate than a sanction that penalizes the parties for the offenses of their counsel." *Worldwide*, 87 F.3d at 1254.

In the Eleventh Circuit, a court confronted with a motion for Rule 11 sanctions must first determine whether the party's claims are objectively frivolous – in view of the facts or law – and then, if they are, whether the person who signed the pleadings should have been aware that they were frivolous; that is, whether he would have been aware that the claims were frivolous had he made a reasonable inquiry. *Id*. If the attorney failed to make a reasonable inquiry, then the court must impose sanctions despite the attorney's good faith belief that the claims were sound. *Footman v. Cheung*, 139 Fed. Appx. 144, 146 (11th Cir. 2005) (citing *Worldwide Primates*, 87 F.3d at 1254)*.*

Mainstream's conduct in filing the Second Amended Complaint is sanctionable. There is no reasonable factual basis to support Mainstream's allegations (i) that Moniker breached any agreement with Mainstream with respect to the registration or renewal of the Domains, or any of the other allegations against Defendants that flow from this false assertion; or (ii) that Defendants failed to deliver the Renewed Domains to Mainstream in July 2009. Mainstream and its counsel would have known this had they conducted even the most rudimentary investigations into the facts and circumstances alleged by reviewing Mainstream's own records, and publicly available records on the Internet, and by logging into its account with Moniker to see whether any of the Renewed Domains were actually in Mainstream's account. Because Mainstream has violated Rule 11, Defendants are entitled to an award of sanctions.

**B.    DEFENDANTS ARE ENTITLED TO AN AWARD OF SANCTIONS BECAUSE MAINSTREAM'S SECOND AMENDED COMPLAINT HAS NO FACTUAL BASIS.**

In order for Mainstream to prevail on its claims in the Second Amended Complaint, it must establish that (1) Moniker had a contractual obligation to both provide notice of the pending deletion of the Domain Registrations, and renew such Domain Registrations; and (2) Moniker failed to comply with those obligations.  The majority of Mainstream's claims in the Second Amended Complaint are based entirely on the misconception that Moniker failed to comply with an obligation to provide notice of the pending deletion of the Domain Registrations and/or renew the Domain Registrations.[3]  At the time the initial Complaint in this case was filed, Mainstream knew, or should have known had they done a preliminary review of their own records, that the facts alleged in support of Mainstream's claims are completely unfounded.  It was Mainstream that failed, whether intentionally or unintentionally, to renew the Domains.

The "core" allegations in the Second Amended Complaint regarding Moniker's purported obligation to renew the Domain Registrations and the breach of that obligation are as follows:

> 16.    These terms and obligations include those in Paragraph 2 of the Contract, which addresses certain fees and payments to be paid to Moniker for its services. As provided in Paragraph 2 regarding automatic renewal, when a domain name registered by Moniker was scheduled to expire, the "client," here Mainstream, agreed to allow its applicable credit cards to be charged for the registrations to be automatically renewed:
>
>> You are solely responsible for ensuring that any services you desire to renew are renewed . . . [a]ny renewal of your services with [Moniker] is subject to our then current terms and payment of all applicable service fees at the time of renewal. In the case of a re-registration the renewal is subject to the domain name registry's acceptance of your domain name registration. You agree that if you paid by credit card for any services

---

[3] The only remaining claim that is arguably not based entirely on such misconception relates to the Renewed Domains. This claim is also completely frivolous, as more fully set forth in Section II.B.4, *infra*.

provided by Moniker, Moniker is authorized . . . to automatically charge your credit card and renew the applicable services on or before their renewal date using the credit card information you have provided us, unless you have notified us (as provided herein) that you do not wish to participate in our automatic renewal process.

17.     Paragraph 6 of the Contract addresses domain name renewals, expirations and transfers. More specifically, the contract sets forth the procedure in the event of expiration of domain names hosted and/or previously registered through Moniker's services. When a domain name registration expires, it may be maintained by Moniker for a grace period during which, Moniker can have a placard site (with certain sponsored links) attached to the domain name registration. Moniker affords the opportunity to have the customer (here Mainstream) obtain a portion of any revenues realized from this placard site – so long as certain contact and financial information is provided. Lastly, Paragraph 6 incorporates by reference Moniker's "Domain Deletion and Auto-Renew Policy."

18.     Attached [to the Second Amended Complaint]…is a true and correct copy of the "Domain Deletion and Auto-Renewal Policy" (hereinafter the "Renewal Policy") applicable during the relevant period of the relationship between Moniker and Mainstream. …the Renewal Policy specifies that for customers who chose Moniker's "Auto-Renew" feature, Moniker will automatically renew the domain name registrations, so long as the customer has a valid credit card on file. Otherwise, Moniker - starting some 75 days prior to expiration of each applicable domain name – would contact its customer via email (or other agreed means) as to renewal. If the customer does not respond, these emails may continue for up to 21 days after the expiration of that domain name registration. Moniker agreed to send these reminders weekly during this 99-day (sic) period.

19.     In violation of the terms of the Contract (and the incorporated Renewal Policy), Moniker allowed numerous domain name registrations previously registered, owned and monetized by Mainstream to lapse without the requisite notice…This occurred despite the fact that Mainstream had provided Moniker credit card information and authorization to charge those credit cards for purposes of renewing these…domain names registered through Mainstream's agreement with Moniker.

20.     Upon information and belief, the weekly email notices regarding expiration which were required to be sent during the 99-day (sic) period were either never sent, or transmitted in a deliberate and capricious manner so that they would be blocked by Mainstream's e-mail computer systems, including through their reasonable and standard spam filters.

23.     In each instance of these improper domain name registration transfers, Moniker wholly failed to provide the Auto-Renewal of the domain name registrations under its own Renewal Policy or alternatively, to charge applicable credit cards based upon payment information provided by Mainstream. Moreover,

   Moniker failed to provide notice to Mainstream via email or any other means under in the Renewal Policy.

   24. Upon information and belief, Defendants intentionally and negligently violated and/or failed to abide by their own Contract and Renewal Policy, ultimately causing these domain names registered in Mainstream's name to lapse. When that happened, Moniker caused the registration to be transferred to Oversee, or one of Oversee's subsidiaries such as Domain Sponsor for purposes of unfair competition by using the goodwill associated with and established by Mainstream in these websites. Oversee then utilized the domain name registration for its own monetary and pecuniary gain in an improper manner. Upon information and belief, Defendants knowingly and intentionally caused these results, knowing they would cause harm to Mainstream.

   25. Defendants have converted some 83,000 domain names previously registered, monetized and employed by Mainstream…

As more fully set forth herein, each of the foregoing allegations is completely false, which would have been readily apparent to Mainstream and its counsel had they conducted even a cursory, pre-filing investigation.

### 1. None of the Domains were set by Mainstream for Auto-Renew at the time of expiration.

In paragraphs 16-24 of the Second Amended Complaint, Mainstream alleges, repeatedly, that Moniker breached the Contract by failing to automatically renew the Domain Registrations. First, the total number of Domain Registrations that lapsed within Mainstream's Moniker accounts due to <u>Mainstream's</u> failure to renew them was not 83,000, but rather 79,965.[4] More importantly, consistent with Mainstream's instructions, <u>none</u> of the 79,965 Domains were set for Auto-Renew at the time of the expiration of each of the Domain Registrations. Declaration of Kevin Hite ("Hite Dec."), a copy of which is attached hereto as Exhibit "A," at ¶ 6. James Morin, Mainstream's Senior Accountant,

---

[4] This number represents the <u>total</u> number of domains deleted from Mainstream's account due to non-renewal by Mainstream. Hite Dec. at ¶ 5. Since Mainstream has thus far failed to provide any indication of which domains comprise the 83,000 noted above, it is unclear whether Mainstream believes all 79,965 Domain Registrations should have been renewed.

advised Moniker in writing that Mainstream did not want the Auto-Renew feature in the account where the Domains were maintained, and instructed Moniker to ensure that the Auto-Renew feature had, in fact, been turned off. *Id.* Moniker followed those instructions and the Auto-Renew feature was off on each of the Domain Registrations as of their respective dates of expiration.[5]  Mainstream could easily have turned on the Auto-Renew feature at any time prior to expiration by accessing its account and simply clicking the setting to turn the feature on. *Id.* at ¶ 7.

As set forth above, Mainstream's allegations regarding Moniker's purported failure to carry out Auto-Renew on the Domain Registrations are completely untrue.  There is no "information" to support the allegations, and any "belief" that Mainstream has in this claim is wholly unreasonable.

### 2.     Moniker provided Mainstream with proper notice of the registration/expiration status of the Domains.

Because Mainstream obviously knows that none of the Domains were set to Auto-Renew at the time of expiration, it must retreat to the only available avenue for a purported claim against Moniker – failure to provide pre and post-expiration notice regarding pending expiration of the Domains.  Even then, in a transparent effort to avoid accountability, Mainstream prefaces paragraphs 20 and 24, which contain its two key "factual" allegations in the Second Amended Complaint regarding the alleged breach of notice requirement, with the phrase "upon information and belief."  Mainstream's conditional, prefatory statement offers it no protection from Rule 11 sanctions.

The Supreme Court has clarified that a complaint "does not need detailed factual allegations, [but] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'

---

[5] Mainstream had two accounts with Moniker – Account No. 11474 and Account No. 22298.  At the time that each of the Domains were set to expire, they were, at Mainstream's direction, held in Account No. 11474.  Hite Dec. at page 2, fn. 2.

requires more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 127 S. Ct. 1955, 1964-65 (2007). Applying this standard, one court commented:

> Rather than provide "[f]actual allegations" sufficient to make their claims for relief more than mere conjecture, Plaintiffs' allegations of infringement lack any factual grounding whatsoever, and rely instead on their "inform[ation] and belie[f]" that [defendant] willfully violated their exclusive rights. This is the type of "speculative" pleading which is insufficient under *Twombly*, and Plaintiffs' complaint is therefore inadequate.

*Atlantic Recording Corp. v. Brennan*, 534 F. Supp. 2d 278, 283 (D. Conn. 2008).

Specifically, in the Second Amended Complaint at ¶¶ 20 and 24, Mainstream alleges, on "information and belief," that Moniker, in violation of its agreement with Mainstream, failed to provide Mainstream with the required notice regarding the pending expiration of the registrations of the Domains, and that Defendants failed to abide by the Contract and Renewal Policy.[6] These two allegations, and the allegations that flow therefrom, are completely untrue. More importantly, Mainstream discovered nothing prior to filing suit to make it believe that the allegations are true.

As with its claim of breach relating to the Auto-Renew procedure, to make its allegations regarding the alleged breach of the notice requirements, Mainstream had to have obtained some "information" through a pre-filing investigation. As explained below, there is no "information" that Mainstream could have obtained to support its false accusations. Furthermore, as part of any pre-filing investigation, Mainstream or its

---

[6] Paragraph 24 of the Second Amended Complaint alleges, in pertinent part, that "[u]pon information and belief, <u>Defendants</u> intentionally and negligently violated and/or failed to abide by their own Contract and Renewal Policy, ultimately causing these domain names registered in Mainstream's name to lapse." (Emphasis added). Mainstream does not allege, nor could it, that Oversee had any contractual relationship with Mainstream, whether as to registration or renewal of the Domains. In fact, Mainstream admits, at ¶¶ 15-18 of the Second Amended Complaint, that the only contract was between Moniker and Mainstream. Thus, its allegation in paragraph 24 regarding Defendant<u>s</u> having failed to abide by <u>their</u> Contract and Renewal Policy, cannot, as a matter of law, be true as to Oversee.

counsel could and should have simply requested that Moniker provide copies of such notices in order to verify that they were sent, a request with which Moniker would have readily complied.

Moniker, using the contact information supplied by Mainstream, which information Mainstream was contractually obligated to maintain current, provided Mainstream with the required notices regarding the pending deactivation, expiration and/or deletion of the Domain Registrations (the "Notices"). Hite Dec. at ¶ 9. Specifically, Notices were sent on a continuous basis to Mainstream containing: (i) a list of the expired Domain Registrations pending deactivation; (ii) a list of expired Domain Registrations pending deletion; (iii) a list of Domain Registrations expiring within 7 days of the notice; (iv) a list of Domain Registrations expiring within 35 days of the notice; and (v) a list of the Domain Registrations expiring within 75 days of the notice.[7] Between April 2006 and the time that Mainstream filed its initial Complaint in this matter, hundreds of Notices had been sent on a regular basis to Mainstream via email to one of the following email addresses provided by Mainstream to Moniker: daniel@mainstreamad.com; nathan@mainstreamad.com; or eric@mainstreamad.com. *Id*. at ¶¶ 10, 11.[8]

---

[7] Because of the size of each of the Notices (i.e. hundreds of pages per notice for many of the Notices when converted to .pdf), attaching the Notices would be too voluminous. An example of the Notices, demonstrating the information contained therein, is attached to the Hite Declaration. All of the Notices are being produced, in full, to Mainstream in response to its First Request for Production to Defendants. Moreover, at the Court's request, Defendants will make copies of the Notices available to the Court.

[8] The vast majority of the Notices were sent to daniel@mainstreamad.com. Hite Dec. at page 3, fn. 4.

### 3. In addition to the Notices, Mainstream had actual knowledge that the Domains were being deleted due to its failure to renew

As set forth, *supra*, in the Second Amended Complaint, Mainstream claims, *inter alia*, that Moniker failed to provide it with notice regarding the pending expiration and deletion of the Domain Registrations.  In addition to making baseless allegations regarding lack of notice from Moniker, Mainstream also fails to disclose, for obvious reasons, that during the time the Domain Registrations were expiring due to Mainstream's failure to renew, Mainstream was continuously accessing its account at Moniker to review its other domain name registrations, some of which, like the Domains, were not set for Auto-Renew.  While accessing its account, Mainstream manually renewed certain domain name registrations that were not set for Auto-Renew, while deliberately allowing others to lapse.  Accordingly, Mainstream would have, at the same time it was reviewing these other domain names, (i) clearly seen that the Domain Registrations were pending deletion; and (ii) been able to renew any of the Domain Registrations it wanted to renew.  Hite Dec. at ¶¶ 12-14.

### 4. The 3,652 Renewed Domains are in Mainstream's account at Moniker and have been since July 16, 2009

Mainstream alleges that, in July 2009, it paid Moniker $132,965.00 to "buy back" 3,652 lapsed domain names.  Second Amended Complaint at ¶¶ 27 and 34.  Mainstream further alleges that it never received those Renewed Domains and that such domain names "remain in the possession and control of Oversee." *Id.*  This claim is further evidence of Mainstream and its counsel's apparent failure to conduct any pre-filing inquiry of Mainstream's own account records because, had any such inquiry taken place, this

claim would never have been made. The Renewed Domains have been in Mainstream's account with Moniker since July 16, 2009, and thus, they were in the account when Mainstream filed its initial complaint in this matter on October 6, 2011, its Amended Complaint on December 6, 2011, and its Second Amended Complaint on January 13, 2012. Hite Dec. at ¶ 16. Moreover, since July 16, 2009, Mainstream has accessed its account and taken action to manage these names, including changing registrant contact information, name servers and renewal information. *Id.* at ¶ 17. It is thus clear that Mainstream failed to make even the most basic inquiry to determine if the Renewed Domains were in its account, and therefore, Mainstream's allegations regarding the Renewed Domains are sanctionable.

### C. ALL OF THE CAUSES OF ACTION IN THE SECOND AMENDED COMPLAINT ARE WITHOUT MERIT

Mainstream's Second Amended Complaint not only lacks any factual support; it also lacks any basis in law because the Domain Registrations lapsed, not due to any action or inaction on the part of Moniker or Oversee, but rather, because Mainstream itself failed to renew the Domain Registrations, whether intentionally or unintentionally. Put simply, Mainstream allowed the Domain Registrations to lapse, so there can be no liability for any of the claims against either Moniker or Oversee relating to the Domain Registrations. Similarly, unless Mainstream can prove that the 3,652 Renewed Domains for which it paid in July 2009 are not and, as of the filing of this action, were not, in its account, there can be no liability for any of the claims relating to those domains either.

Working backwards, Mainstream purposefully identified a set of facts it believed it needed to state its claims against Defendants, and proceeded to allege, in some instances, "upon information and belief," the existence of those facts, *albeit* falsely. This is a convenient legal strategy for a plaintiff lacking a cause of action, but one that the Rules of

Civil Procedure condemn.  In attempting to avoid dismissal of its claims against Defendants, Mainstream has run afoul of Rule 11 and should be sanctioned.

Each of the counts regarding the Domains in Mainstream's Second Amended Complaint is based upon the same incorrect premise – that Moniker breached its obligations to Mainstream with respect to the renewal of the Domain Registrations and improperly allowed such registrations to lapse without proper notice, causing damage to Mainstream.  The counts regarding the Renewed Domains are also based on an incorrect premise – that Moniker failed to deliver the Renewed Domains to Mainstream.  Each count is frivolous.

### 1.  The Breach of Contract Claim

It is undisputed that, for a breach of contract claim regarding the Domains, Moniker would have to have breached an obligation under its agreement with Mainstream to renew the Domain Registrations through Auto-Renew or to provide Mainstream with notice of the pending expiration of the Domain Registrations.  The facts alleged by Mainstream in support of its claim are false – as of the dates that the Domain Registrations expired, Mainstream did not have **any** of the Domains set to Auto-Renew and Moniker provided all required notices to Mainstream.

For a breach of contract claim based on the July 2009 agreement regarding the Renewed Domains, Mainstream would be required to show that Moniker failed to provide the Renewed Domains to Mainstream as per the terms of the agreement.  As noted above, Moniker provided the Renewed Domains to Mainstream via Mainstream's Moniker Account on July 16, 2009, and the Renewed Domains were still in the account as of the filing of this action and continue to be there today.  As such, there is no factual or legal basis upon which Mainstream can sustain a claim for breach of contract.   Mainstream knew or should

have known, at the time it filed this action, that the allegations upon which Count I is based were and are false.  Moreover, even the most basic pre-filing investigation by Mainstream and its counsel would have revealed the frivolous nature of the claim.

### 2. The Conversion Claim, Lanham Acts Claims, Unfair Competition Claims and Unjust Enrichment Claims

The ability of Mainstream to sustain its claims against Defendants in Counts II through VI of the Second Amended Complaint (conversion, unjust enrichment, federal and common law unfair competition and infringement) would require a finding that Defendants had **improperly** taken and/or benefited from, the use of the Domains.  Mainstream again relies on false allegations for each of these counts.  As set forth above, neither of the Defendants did anything to cause the Domain Registrations to lapse.  Moreover, once the Domain Registrations lapsed, the Domains were no longer the property of Mainstream and became subject to transfer, deletion, re-registration and/or use.[9]

The Contract upon which Mainstream relies and which Mainstream attaches as an exhibit to the Second Amended Complaint, at Section 2 (Fees and Payment), provides, in pertinent part,

> You agree that we may, but are not obligated to, allow you to renew your domain name after its registration term has ended and its expiration date has passed. You agree that after the expiration date of your domain name registration and before it is deleted or renewed, we may direct your domain name to an IP address designated by us, including, without limitation, to an IP address which hosts a parking, under construction, or other temporary page that may include promotions and advertisements for, and links to, Moniker's Web site, Moniker product and service offerings, third-party Web sites, third-party product and service offerings, and/or Internet search

---

[9] Throughout the Second Amended Complaint, Mainstream alleges, in words or substance, that Oversee owns or controls all of the Domains.  This claim is false.  In fact, of the 79,965 Domains deleted over the years due to Mainstream's failure to renew, Oversee owns a total of 156, or 0.19%, of the Domains, having acquired them only after their respective registrations lapsed.   Hite Dec. at ¶ 18.

> engines and/or advertisements, and you agree that we may place our contact information in the WHOIS output for the expired domain name. ***Should you not renew your domain name prior to the expiration date or during any grace period, such grace period to be granted in our sole discretion, you agree that we may, in our sole discretion, renew and transfer the domain name to our control, or to a third party on your behalf (such a transaction is hereinafter referred to as a "Post Term Renewal and Transfer"), and your failure to renew the domain name in question shall constitute your consent to such a Post Term Renewal and Transfer***. (Emphasis added).

Similarly, the Renewal Policy attached to the Second Amended Complaint, provides, in pertinent part,

> If an expired domain name registration is not renewed during any grace period provided by us, pursuant to our Service Agreement, rather than delete the domain name registration, we may, in our sole discretion, attempt to find a third party who is interested in registering, purchasing, or back ordering the domain name, and then renew and transfer the domain name registration to that third party on the customer's behalf. This renewal and transfer process is called a domain sale or "Direct Transfer or Transfer Fulfillment." We will not attempt to complete a Direct Transfer of a domain name registration after expiration if the customer to whom the domain name is registered has notified us by issuing a ticket to Support stating that he or she does not want us to proceed with such a transfer. In this case, the domain name registration will be deleted. A customer's failure to pay for their renewal within 35 days of expiration or to notify us that they do not want us to complete a Direct Transfer constitutes that customer's consent to the Direct Transfer. As described in our Service Agreement, we are not obligated to compensate customers in any way should their previously registered domain be the subject of a Direct Transfer.
>
> ***If an expired domain name registration is not renewed as outlined above, absent extenuating circumstances, we will delete the domain name registration.*** Registry Operators may provide registrars with the ability to "redeem" a deleted domain name registration for a customer, and we in turn may (but are not obligated to) provide customers with an ability to redeem a particular domain name registration. Such a Redemption Grace Period (RGP) is not guaranteed and customers should renew their domain name registration services in advance of the domain name registration expiration date(s) to avoid deletion of domain name registration services. Currently, the Registry Operators provide an RGP for 30 days from the date of deletion. If we decide to provide the redemption service to a customer, we charge a fee of $125.00 US to redeem plus a renewal fee to renew a domain name registration during the RGP. ***If the domain name registration is not redeemed by the expiration of the RGP, it is then placed on "Pending Delete" status for five additional days, after which it is deleted and the***

> ***domain name character string is then once again available for registration.***  (Emphasis added).

Accordingly, by virtue of having registered the Domains, and then, by allowing the Domain Registrations to lapse, Mainstream knew or reasonably should have known that it had specifically **authorized** any transfer, deletion, re-registration and subsequent use of the Domains.  Thus, whether the Domains were actually transferred to and/or used by Oversee or some other third party is irrelevant.  All such action was done with the explicit knowledge and consent of Mainstream.  As with its breach of contract claim, at the time it filed this action, Mainstream knew or reasonably should have known that the allegations upon which the claims in Counts II through VI of the Second Amended Complaint are based were and are false and a pre-filing investigation by Mainstream and its counsel would have revealed the frivolous nature of the claims.

### III. CONCLUSION

For the foregoing reasons, the Defendants move this Court to impose sanctions upon the Plaintiff and/or its Counsel pursuant to Rule 11.

> **DE LA O, MARKO,**
> **MAGOLNICK & LEYTON**
> Attorneys for Defendants
> 3001 S.W. 3rd Avenue
> Miami, Florida 33129
> Telephone: (305) 285-2000
> Facsimile:  (305) 285-5555
>
> By:  /s/Joel S. Magolnick
>   **Joel S. Magolnick**
>   Florida Bar No. 776068
>   magolnick@dmmllaw.com

## CERTIFICATE OF SERVICE

      I hereby certify that on February 7, 2012, I served this Motion on all counsel of record and pro se parties identified below via US Mail and E-mail.

| | |
|---|---|
| Ava K. Doppelt, Esq. | Robert H. Thornburg, Esq. |
| Counsel for Plaintiff | Counsel for Plaintiff |
| Allen, Dyer, Doppelt, Milbrath & Gilchrist, P.A. | Allen, Dyer, Doppelt, Milbrath & Gilchrist, P.A. |
| 255 South Orange Avenue, Suite 1401 | 777 Brickell Avenue, Suite 1114 |
| Post Office Box 3791 | Miami, Florida  33131 |
| Orlando, Florida 32802-3791 | |

      /s/  Joel S. Magolnick
      Joel S. Magolnick